UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY ECONOMUS, <br>     Plaintiff, <br> v. <br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br>     Defendants. | Case No. 18-cv-01071-HSG (DMR) <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO RETAIN CONFIDENTIALITY** <br><br> Re: Dkt. No. 82 |

    Defendants Flint Paul and City and County of San Francisco ("CCSF") filed a motion to retain confidential designations regarding certain documents pursuant to the terms of the parties' stipulated protective order. [Docket Nos. 82 ("Mot"), 109 ("Reply").] Plaintiff Anthony Economus timely opposed. [Docket No. 96 ("Opp").] The undersigned took the motion under submission pending adjudication of Defendants' motion for summary judgment. [Docket No. 187.] The Honorable Haywood S. Gilliam entered summary judgment in favor of Defendants on April 3, 2019. [Docket No. 177.] In so doing, Judge Gilliam issued rulings regarding the confidential treatment of documents filed in conjunction with that motion, many of which overlap with the documents at issue in this motion. Subsequently, Judge Ryu ordered the parties to meet and confer and to file a joint letter that identified which documents, if any, are still in dispute and require adjudication. *See* Docket No. 187. The parties filed a joint letter on April 26, 2019. [Docket No. 189 ("Jt. Ltr.").] This order addresses the two outstanding disputes identified in that letter.

    This dispute is appropriate for determination without oral argument. Civil L.R. 7-1(b). Having considered the parties' submissions, the court grants Defendants' motion to retain confidentiality.

//

## I.  BACKGROUND

On July 11, 2017, Economus took part in an annual downhill skateboarding event on Dolores Street in San Francisco. Dozens of skateboarders participated, and police officers from the San Francisco Police Department ("SFPD"), including Paul, were present. Paul directed a park ranger to park his patrol car in a manner that partially blocked the roadway at the bottom of the downhill course. This still left a gap for skateboarders to pass between the car and the sidewalk. Paul was standing near the gap when Economus skateboarded down the hill. Economus attempted to skateboard through the gap and collided with Paul, causing Economus to fall off his skateboard and sustain injuries. Economus alleges that Paul deliberately shoulder-checked him and then walked away without providing assistance.

On July 2, 2018, the parties filed a stipulated protective order, which was entered by the court on July 11, 2018. [Docket Nos. 27 ("Protective Order"), 28.] The Protective Order permits the parties to designate certain materials produced during discovery as confidential in order to prevent their public disclosure. It states that a party "may challenge a designation of confidentiality at any time," by initiating a dispute resolution process and "providing written notice of each designation it is challenging and describing the basis for each challenge." Protective Order ¶¶ 6.1, 6.2. The Protective Order also states that if the parties cannot resolve a challenge through the meet and confer process, the designating party must file and serve a motion to retain confidentiality. *Id.* ¶ 6.3.

On December 21, 2018, the parties filed a joint discovery letter regarding Defendants' designation of certain documents as confidential pursuant to the Protective Order. [Docket No. 71.] The undersigned ordered that the issues raised in the discovery letter be fully briefed. [Docket No. 73.] The court then took the matter under submission pending a decision on Defendants' motion for summary judgment. Following Judge Gilliam's entry of judgment in favor of Defendants, this court ordered the parties to meet and confer regarding the motion and to file a joint letter identifying which documents, if any, are still in dispute and require adjudication. *See* Docket No. 187.

The parties filed a joint letter on April 26, 2019 which indicated that the confidentiality of

most of the documents at issue in the original motion was no longer in dispute.[1] The remaining issues are whether Defendants properly designated two classes of documentation as confidential: (1) audio recordings of interviews of CCSF employees that were taken as part of the Department of Police Accountability ("DPA") investigation into the complaint against Paul; and (2) the DPA investigator's summary of Paul's interview and analysis of the complaint against Paul. Jt. Ltr. at 2.

## II. ANALYSIS

As a general rule, "the public is permitted access to litigation documents and information produced during discovery." *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002) ("*Phillips*")) (internal quotation marks omitted). However, a court may issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). If a party challenges whether documents have been properly designated as confidential, the party seeking to maintain confidentiality pursuant to a protective order "has the burden of establishing that there is good cause to continue the protection of the discovery material." *In re Roman Catholic Archbishop*, 661 F.3d at 424.

The Ninth Circuit has set out the analysis that courts must engage in when considering whether to retain confidentiality over documents designated pursuant to a protective order:

> First, [a court] must determine whether 'particularized harm will result from disclosure of information to the public.' . . . . Second, if the court concludes that such harm will result from disclosure of the discovery documents, then it must proceed to balance 'the public and private interests to decide whether [maintaining] a protective order is necessary.'

*In re Roman Catholic Archbishop*, 661 F.3d at 424 (internal quotations and citations omitted). The balancing test considers the factors identified by the Third Circuit in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d Cir. 1995):

> 1) whether disclosure will violate any privacy interests;
> 2) whether the information is being sought for a legitimate purpose or for

---

[1] The parties also raised the issue of whether Economus should destroy or return the other confidential materials he obtained in this case pursuant to paragraph 13 of the Protective Order. That issue was not raised in the motion papers and goes well beyond what the court requested in its order for supplemental briefing. *See* Docket No. 187. The court will not consider that issue here.

3

>an improper purpose;
>3) whether disclosure of the information will cause a party embarrassment;
>4) whether confidentiality is being sought over information important to public health and safety;
>5) whether the sharing of information among litigants will promote fairness and efficiency;
>6) whether a party benefitting from the order of confidentiality is a public entity or official; and
>7) whether the case involves issues important to the public.

*Glenmede Trust*, 56 F.3d at 483; *see In re Roman Catholic Archbishop*, 661 F.3d at 424 (directing courts to use these factors to determine whether good cause exists to maintain confidentiality designations).[2]

### A. Audio Recordings of DPA Interviews

The first dispute relates to six audio recordings of interviews of CCSF employees taken as part of the DPA investigation. [Docket No. 83-1 ("Bers Decl."), Exs. D, H-1.] One interview is of Paul, and the other interviews are of police officers and a San Francisco Park Ranger who were on scene.

#### 1. Particularized Harm

Under *In re Roman Catholic Archbishop*, the initial inquiry is whether the party opposing disclosure meets its burden to show that "particularized harm will result from disclosure of information to the public." 661 F.3d at 424 (quoting *Phillips*, 307 F.3d at 1211). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)). The party seeking to maintain confidentiality designations under a stipulated protective order must "allege specific prejudice or harm." *Phillips*, 307 F.3d at 1210.

Defendants argue that these recordings should be kept confidential because investigations into complaints made about police officers are confidential under California law. Mot. at 6. They

---

[2] Defendants argue that the *Glenmede Trust* factors do not apply to an analysis of "good cause" but rather relate to the "compelling reasons" standard used to evaluate motions to seal court records. *See* Reply at 2. However, *In re Roman Catholic Archbishop* makes clear that the balancing test in *Glenmede Trust* is used to consider a "motion for a continuation of [a] protective order," such as the current one. 661 F.3d at 424.

4

maintain that these files were produced pursuant to a confidential administrative hearing process and disclosure would have a chilling effect on future DPA investigations. Jt. Ltr. at 2, Mot. at 6-7. They also contend that these records "were not relevant to an adjudication of the matter on the merits, lowering the public's legitimate interest in them." Jt. Ltr. at 2.

Defendants submitted a declaration from Sarah Hawkins, the Chief of Staff at DPA. [Docket No. 82-26 ("Hawkins Decl.").] She states that DPA is an "independent agency required by the City Charter of the City and County of San Francisco to promptly, fairly and impartially investigate citizen complaints against San Francisco police officers, make policy recommendations regarding police practices and conduct periodic audits of the San Francisco Police Department." Hawkins Decl. ¶ 2. She testifies that San Francisco police officers "understand and expect that . . . [their] private information will not be voluntarily disclosed by the DPA," and that "disclosure of certain information about law enforcement officers can jeopardize their safety, the safety of witnesses, and the safety of their families." *Id.* ¶ 6. She explains that officers are required to answer questions during DPA investigations and that failure to do so may result in administrative discipline, including termination. *Id.* ¶¶ 7-8. Hawkins avers that disclosures of DPA investigative documents like the recordings at issue will have a chilling effect on future DPA investigations, because "[o]fficers and other witnesses will be less candid and forthcoming during interviews." *Id.* ¶ 11. She also explains that DPA is granted access to confidential files maintained by various city agencies because the DPA process is "presumed to be confidential." *Id.*

Defendants also submitted a declaration from Lieutenant Kathryn Waaland of SFPD, who is the Commanding Officer of the Legal Division of SFPD and therefore responsible for legal matters involving that department. [Docket No. 82-25 ("Waaland Decl").] Waaland's declaration raises similar concerns about the public disclosure of DPA investigative documents. Additionally, she states that supervisory police officers "may become reluctant to evaluate subordinates critically and candidly" if they know that administrative investigative documents may be disclosed to the public. Waaland Decl. ¶ 10.

Economus argues that Defendants "make generalized statements that disclosure and non-confidentiality will result in some vague harm to the government's process and intra-agency

5

functions without identifying any specific examples and/or articulated reasons for harm to any specific officers, person or department." Opp. at 5. He contends that the recorded interviews do not reveal sensitive personal information and therefore do not implicate the privacy of individual officers. *Id.* Economus also points out that the DPA's findings and SFPD's refusal to discipline Paul have already been publicized, so it is not clear that there would be any further security concern that has not already been made public. *Id.* at 6.

Economus cites *Harmon v. City of Santa Clara*, 323 F.R.D. 617, 625 (N.D. Cal. 2018) for the proposition that maintaining the anonymity of police officers is not sufficient to maintain confidentiality designations on video footage produced during discovery. In that case, a plaintiff sued the City of Santa Clara and various police officers for civil rights abuses relating to injuries she suffered when she refused to allow the officers inside her home without a warrant. 323 F.R.D. at 618. The defendants produced a video of the incident taken by one of the officer's body cameras during the underlying incident and designated it as confidential under a stipulated protective order. *Id.* at 620. The case ultimately settled, but the parties subsequently litigated the issue of whether the video should be treated as confidential pursuant to the protective order. *Id.* at 619. The court found that the defendants had not met their burden to show particularized harm that would occur through disclosure of the video. *Id.* at 624. The court considered the most compelling argument to be that the officers depicted in the video were part of a specialized team that worked undercover and releasing the video publicly would compromise their ability to work with some level of anonymity. *Id.* However, the court considered this concern to be insufficient to outweigh the public's interest in transparency. *Id.* at 624-25. It noted that the incident took place in the plaintiff's driveway and was clearly visible from the public street. *Id.* at 625. It also considered that the police department, as a public agency, does not have the same privacy concerns as individuals. *Id.* at 625. The court concluded that in civil rights cases against a police department, discovery should be "moderately pre-weighted in favor of disclosure" and the strong public interest in the case relative to the "minimal risk of harm" further weighed toward non-confidentiality. *Id.* It accordingly ordered that the confidentiality designation on the videos be removed. *Id.* at 626.

*Harmon* is distinguishable from the present issue. There, the harm identified by the

defendants was the need for plain clothes officers to maintain anonymity in order to continue working undercover. This concern, however, was minimized by the particular facts of the case, given that the incident at issue had taken place in view of a public street. Here, by contrast, Defendants state that the DPA investigative process is confidential, and officers, the DPA, and various city agencies rely on confidentiality to maintain the integrity of the review process. Waaland Decl. ¶ 10; Hawkins Decl. ¶¶ 7-8. There is no indication in this case that the confidentiality of the DPA investigation was undermined by the particular circumstances in which it was conducted. Although Economus contends that certain facts of the investigation have already been made public, such as the DPA findings and the SFPD's decision to not discipline Paul, the information contained in the recordings is far more detailed than the publicly available information cited by Economus. *See* Opp. at 6. Unlike in *Harmon*, where the private information was solely the identity of the police officers, the information at stake here is not merely the names of officers who were on scene and participated in the DPA investigation. Instead, many of the recordings are an hour or longer and reveal detailed perceptions of the officers who witnessed the incident. Therefore, much of the information Defendants seek to protect has not already been released to the public.

Economus also cites *Soto v. City of Concord*, 162 F.R.D. 603 (N.D. Cal. 1995) and *Kelly v. City of San Jose*, 114 F.R.D. 653 (N.D. Cal. 1987) for the proposition that discovery in the context of a civil rights suit against a police department should be "moderately pre-weighted in favor of disclosure." *See* Jt. Ltr. at 4; *Soto*, 162 F.R.D. at 613 (quoting *Kelly*, 114 F.R.D. at 661). Both cases involved civil rights suits against police departments, and in both cases, the plaintiffs sought various internal affairs documents, including investigative documents. *Soto*, 162 F.R.D. at 610; *Kelly*, 114 F.R.D. at 655. In *Soto*, the defendants raised concerns similar to the ones present in this case; namely, that disclosure of internal investigation documents would hamper "frank discussion and evaluation within their police department." 162 F.R.D. at 611. While the court found that the defendants had not met their burden to show that the documents were privileged, it ordered them to produce the internal affairs documents subject to a protective order. *Id.* at 614 ("The use of a carefully drafted protective order, under which only Plaintiff and his lawyer have access to the material, substantially reduces the confidentiality interests asserted by Defendants.") The case also

cited numerous cases approving of the use of protective orders in discovering information contained in confidential police files. *Id.* (citing cases). *Kelly* similarly dealt with discovery related to confidential investigation files. 114 F.R.D. at 655. The court recognized that disclosure of the files may harm "concededly legitimate law enforcement interests," but found that the defendants had not established that the threat of harm outweighed the competing interests (such as the interests of civil rights plaintiffs). *Id.* at 661-68. However, the court ordered the information produced subject to a protective order, recognizing that "[t]he weight of law enforcement's interest drops dramatically . . . . when a court imposes a tightly drawn protective order on the disclosure of such material, so that only counsel for plaintiff, and perhaps his expert, has access to it." *Id.* at 666. Therefore, both *Kelly* and *Soto* affirm that civil rights plaintiffs should generally have access to at least some confidential investigative documents in order to prosecute their cases, but also determined that protective orders could mitigate the potential harm to law enforcement interests.

In this case, Defendants have proffered numerous reasons to prevent public disclosure of DPA investigative documents. The strongest of these relates to DPA's interest in continuing to conduct confidential investigations into police conduct. Having DPA internal confidential processes and analysis widely available to the public may have many consequences that would hamper the ability of DPA to fully investigate citizen complaints into the operation of SFPD. This may be especially true where, as here, the information sought was not relied on to decide the final disposition of the action. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (determining that the "strong presumption of [public] access to judicial records" does not apply where the records at issue are not attached to dispositive motions because those documents are often "unrelated, or only tangentially related to the underlying cause of action") (further quotations and citations omitted). Here, Economus was afforded access to the confidential files at issue in order to fully prosecute his civil rights case. Had the recorded interviews been relied upon or even submitted as part of either parties' arguments in the summary judgment motion, the analysis might be different. *See id.* (applying the "compelling reasons" standard to documents attached to dispositive motions).

In sum, Defendants have met their burden to show the risk of particularized harm from the public disclosure of confidential DPA investigative documents.

8

## 2. Balancing Test

Having determined that Defendants have satisfied the first step of the analysis provided by *In re Roman Catholic Archbishop*, the court now turns to the factors articulated in *Glenmede Trust*.

### a. Privacy Interests

The first *Glenmede Trust* factor inquires whether "disclosure will violate any privacy interests." *Glenmede Trust*, 56 F.3d at 483. Defendants make passing references to privacy interests, but do not develop any privacy argument specific to the interview recordings at issue. The interviews contain various officers' perception of the event underlying this case, but do not reveal personal information about the officers themselves other than their names. The mere identity of the officers who gave witness interviews in connection with the DPA investigation does not raise a significant, if any, privacy concern.

Accordingly, the first factor weighs in favor of disclosure.

### b. Legitimate Purpose for Disclosure

The second factor looks at whether the information is sought for a legitimate purpose. *Glenmede Trust*, 56 F.3d at 483. Economus explains that he wants the information in the DPA files for two reasons. First, he seeks the information for the purpose of "holding accountable Defendants for civil rights violations," specifically by "bring[ing] [to light] the City's nefarious business of refusing to hold officers who attack citizens accountable." Opp. at 7-8. Second, he states that removing the confidentiality designations will permit him to litigate his case "unrestrained by the burdens placed on confidential documents." *Id.* at 8.

As for the first reason, Economus does not explain how the DPA files will assist in bringing to light SFPD and CCSF's practices regarding police discipline, or how he would use them for that end. The particular documents at issue here are recording interviews of CCSF employees who witnessed the incident; there is not material contained in the interviews that discusses Defendants' disciplinary practices, or DPA's evaluation, analysis, or recommendations regarding disciplinary action against Paul. Instead, the recordings merely reflect the officers' perceptions of the event underlying this action. Further, Economus's stated need for these files to assist in holding Defendants accountable for alleged civil rights violations is belied by the fact that he did not use or

9

rely on any of these files in his briefing for the summary judgment motion. The second issue Economus raises is moot, given that this case has been closed.

Accordingly, this factor weighs against disclosure.

### c. Embarrassment to a Party

The third *Glenmede Trust* factor considers whether disclosure of the information will cause a party embarrassment. *Glenmede Trust*, 56 F.3d at 483. Defendants' declarants Hawkins and Waaland make a general averment that disclosure of "certain information about law enforcement officers can be used to embarrass, harass or undermine an officer's professional objectives in the field." Waaland Decl. ¶ 6; *see also* Hawkins Decl. ¶¶ 6-8. However, neither these declarations nor Defendants' briefing explain which information specifically could be used to embarrass a party in this case. The interview recordings at issue record statements by CCSF employees who witnessed the incident, which are largely factual descriptions about what they saw rather than personal details about the officers themselves. There is no apparent information contained in the interviews that would embarrass any of the parties.

This factor weighs in favor of disclosure.

### d. Importance to Public Health and Safety

The fourth factor looks at whether "confidentiality is being sought over information important to public health and safety." *Glenmede Trust*, 56 F.3d at 483. Economus argues that the confidential information at issue is important to public safety because "[t]he public deserves to know if an officer is attacking citizens and not being disciplined and/or re-trained by the department." Opp. at 7. However, he does not describe how the interview recordings of CCSF employees relate to this concern. The interviews contain various factual viewpoints of the incident from several witnesses, and do not contain information relating to SFPD's disciplinary procedures or DPA's recommendations and analysis. While the issues underlying this case are undoubtedly important to public health and safety, public disclosure of the specific information at issue does not appear to forward these objectives.

Accordingly, this factor weighs against disclosure.

//

#### e. Promotion of Fairness and Efficiency

The fifth factor inquires "whether the sharing of information among litigants will promote fairness and efficiency." *Glenmede Trust*, 56 F.3d at 483. This consideration is related to the public's interest in open proceedings. *Id.* at 484-85. Specifically, "[f]ederal courts should not provide a shield to potential claims by entering broad protective orders that prevent public disclosure of relevant information." *Id.* at 485. Economus asserts that sharing information will "promote fairness to Plaintiff who deserves to share with the public the police department's failure to discipline his assailant." Opp. at 7. This general assertion again does not address how the recorded interviews specifically would assist in that goal, as the recordings do not detail anything about SFPD's disciplinary actions toward Paul. As Economus points out, the fact that SFPD did not discipline Paul is already public information. Opp. at 6. He does not elucidate how the interviews of CCSF employees will bring to light additional information about SFPD's disciplinary proceedings. Additionally, the concern identified in *Glenmede Trust* relates to "public disclosure of *relevant* information," and is less implicated when the information sought was not relied on in deciding the disposition of the case. 56 F.3d at 485; *see Kamakana*, 447 F.3d at 1179 (explaining that the "strong presumption of [public] access to judicial records" does not apply where the records at issue are not attached to dispositive motions because those documents are often "unrelated, or only tangentially related to the underlying cause of action").

This factor weighs against disclosure.

#### f. Benefit to Public Entity or Official

The sixth factor considered under the *Glenmede Trust* balancing test is "whether a party benefitting from the order of confidentiality is a public entity or official." 56 F.3d at 483. The defendants in this case are two public entities and one individual. Most of the confidentiality interests asserted by Defendants relate to the need to preserve the confidentiality of DPA's investigative process, where DPA itself is a public entity. However, it should be noted that this inquiry is not completely straightforward because DPA is not a party. Although DPA is a department within the umbrella of CCSF, it is also an independent agency tasked with the mission of "promptly, fairly and impartially investigat[ing] citizen complaints against San Francisco police

11

officers." Hawkins Decl. ¶ 2. Arguably, the benefits of preserving DPA independence and confidentiality extend to the general public instead of or in addition to CCSF and SFPD.

This factor is neutral.

### g. Importance of Issues to the Public

The final factor looks at "whether the case involves issues important to the public." *Glenmede Trust*, 56 F.3d at 483. As emphasized previously, this case undoubtedly contains issues that are important to the public, including SFPD and CCSF's response to citizen complaints about police conduct. However, it is unclear how the specific information sought advances the public interest in the issues underlying this case. This is particularly true given that Economus had access to these confidential files in order to prosecute his individual claims; these files were not used or relied upon by either party in the summary judgement proceedings; and the interview recordings do not contain information about SFPD and CCSF's disciplinary process. Accordingly, this factor weighs against disclosure.

In sum, balancing the factors laid out by *Glenmede Trust* and adopted by the Ninth Circuit, the court finds that the interest in maintaining a confidential investigation process into complaints of police conduct outweighs the interest in public disclosure of investigative documents. Accordingly, the court grants Defendants' motion to retain confidentiality as to these documents.

### B. DPA Summary and Analysis

The parties' joint letter states that there is a dispute about the confidentiality designations for the DPA investigator's "subjective summary of Sergeant Paul's compelled interview, and its subjective, non-final analysis of the complaint against Sergeant Paul." Jt. Ltr. at 2. Both parties refer to these documents by Bates numbers CCSF_ECONOMUS 002262-2267. *Id.* at 2, 3. No documents with these Bates numbers were filed with the administrative motion to seal accompanying the motion to retain confidentiality, nor did either party reference these documents in the original briefing on the motion. Furthermore, Defendants filed the meet and confer letters from Economus in which he challenged various confidentiality designations pursuant to the terms of the Protective Order. [Docket No. 82-1, Exs. I, M.] Neither letter refers to documents with Bates numbers 002262-2267, although Economus identifies the other challenged documents by their Bates

numbers. Neither letter appears to contain a description of the materials at issue here. Therefore, there is no indication that Economus raised any challenge to the confidentiality designations on these documents prior to the filing of the joint letter on April 26, 2019, well after the motion to retain confidentiality was fully briefed.

As Economus did not properly challenge the confidentiality designation of these documents pursuant to the terms of the Protective Order, that issue is not presently before the court. Accordingly, the court declines to lift the confidentiality designations on those documents.

## III. CONCLUSION

For the reasons stated above, the court grants Defendants' motion to retain confidentiality. The documents identified by Bates numbers CCSF_ECONOMUS 000837-841, 00117, and 002262-2267 shall remain confidential pursuant to the terms of the Protective Order entered in this case.

**IT IS SO ORDERED.**

Dated: August 15, 2019



Donna M. Ryu
United States Magistrate Judge